UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

_____

UNITED STATES OF AMERICA,

          *Plaintiff,*

    *vs.*                                  Case No. 20-cr-78-wmc

ALAN J. LIPHART,

          *Defendant.*

_____

## SENTENCING MEMORANDUM

Alan Liphart is 37 years-old, facing a sentence for a crime he committed when he was 31 years-old. Though he's not the man he was six years ago, the brute fact remains that he's not been held accountable for his choices back in 2015. To be sure, he's been to prison twice since the offense conduct. But it's also fair to say that if the criminal justice system had known then what it knows now, Liphart would be imprisoned still today.

The Court should sentence Liphart to a concurrent 84 months' imprisonment because the sentence recognizes that he didn't commit the crime in 2020, while also punishing him for his 2015 conduct in ways that his intervening prison terms did not and could not.

**1.      Liphart's sexuality has caused problems since his adolescence.**

Developing a healthy sexuality is a challenge for all teenagers. But starting around age 15, Liphart's development showed outlier troubles. The first was his transgression of age boundaries. There was nothing unhealthy about Liphart's homosexuality. But his sexual contact with a much younger male was. (Presentence Report, ¶ 63.) Whatever agency Liphart had at the time, the younger male had even less. At a minimum, the event revealed that Liphart had a lot to learn about boundaries. The second was treating sex as transactional rather than expressive. Again, his attraction to a fellow teenager wasn't unhealthy. But Liphart's harassing him was, as was Liphart's offering him cash as an inducement for sexual contact. (PSR, ¶ 63.)

It is unfortunate that the State chose to respond with criminal charges in adult court to Liphart's transgressions. He was barely 15 years-old, and Monroe County already had thrown in the towel on getting him back on track to mature adulthood. He was on pretrial supervision for the next three years before the Circuit Court sentenced him. In June 2002, Liphart had just turned 18 years-old when—to its credit—the Circuit Court imposed a three-year probationary term. (*See* PSR, ¶ 63.) It didn't treat him as unsalvageable.

The criminal punishment did not have the desired effect. In August 2002, Liphart approached an 11-year-old, propositioning him for oral sex.

2

(*See* PSR, ¶ 64.) The same two problems from adolescence hadn't been addressed. Liphart was only two months into his probationary term, and he attempted to pay a much younger male for sexual contact. The Circuit Court responded by imposing 12 months in county jail with two years' probation to follow. (*See* PSR, ¶¶ 63-64.) Liphart was still very young, turning 19-years-old in the Green County Jail. (*See* PSR, ¶ 64.)

By the time he was 20, Liphart was back in the community, serving his probationary term. Understandably, he had an electronic-location-monitoring condition—but with approval to leave home for (the much needed) sex offender treatment. (PSR, ¶ 64.) To his credit, he was employed during that time. But he also was using his limited freedom to follow minor males. In October 2004, he was revoked after propositioning an adult male with whom he had attended high school. While not illegal, the act certainly revealed an unhealthy—and recurring—aspect of Liphart's sexuality. Propositioning the acquaintance crossed a social boundary, if not a strictly legal one. (*See* PSR, ¶ 64.)

## 2.    Liphart's choices put him in prison for nearly all of his 20's.

Given that Liphart now was a registered sex offender, one would have hoped that he had gotten the message. He hadn't. He turned 21 years-old in May 2005. (*See* PSR, Identifying Data.) The next month he was

arrested for attempting to pay a 13-year-old and a 12-year-old for oral sex. (*See* PSR, ¶ 66.) The Lafayette County Circuit Court's response was severe though understandable. No doubt Liphart hadn't committed a contact-offense in six years. His efforts to do so were hapless, but his persistence was more than the court could bear. It sentenced him to eight years' imprisonment with five years' extended supervision. (PSR, ¶ 65.)

Liphart served the full-term. He went in at age 21 and was released to extended supervision at age 29. (PSR, ¶ 65.) The bulk of those years (2007 to 2012) he spent at Oshkosh, where he participated in sex-offender programming. (PSR, ¶ 65.) He may have been in his 20's, but Liphart still was acting with an adolescent preoccupation with sex. For instance, he was kicked out of the program for having sex with another inmate. (PSR, ¶ 65.) His problems with his sexuality were now interfering with the solutions for those problems. No doubt prison is a less than ideal setting for developing a mature, healthy sexuality. But given Liphart's choices in the community, the setting's burden was his to bear.

### 3.  Liphart's first extended-supervision term (2013 to 2017) was not the mixed-bag it may have appeared to be at the time.

Liphart's release from prison in June 2013 started off well enough. He was employed, and he participated in sex-offender treatment groups. He

stayed in touch with his agent and initially followed the rules about submitting "requests for contact with unapproved individuals." (*See* PSR, ¶ 65.) He had missteps, but they weren't calamitous. In March 2014, he lied during a polygraph examination. He hadn't told his agent that "he had contact with his cousin's children the day prior while he was visiting his grandmother." (PSR, ¶ 65.) But there were no approved chaperones there, so Liphart knew his presence was a violation—and he didn't disclose it. In October, he was driving when he "flagged down" a male jogger, asking if the jogger or anyone the jogger knew was bisexual. (PSR, ¶ 65.) Again, neither violation was criminal, but deception with his agent and cruising for sex aren't prosocial either.

The offense conduct here shows that Liphart's 2014 violations weren't just bumps in the road. He completed sex-offender programming in 2015, but his facilitator's suspicions at the time would turn out to be spot-on. Liphart clearly wasn't internalizing the program's lessons. He showed a "lack of development in healthy relationships." (PSR, ¶ 65.) Either he would cling to young males, wanting to marry them after knowingly for just a few weeks. Or he would fall prey to relationships where men would take advantage of him monetarily. (PSR, ¶ 65.) What the facilitation didn't know was even worse. The offense conduct here began in August 2015. And it had

Liphart's familiar hallmarks—he was paying for sex with a high school freshman. (PSR, ¶¶ 21-26.) He solicited and received sexually explicit images from the underage male. (PSR, ¶ 22.)

Of course, at the time all of this was unknown to his probation agent. In 2016, Liphart moved back to Browntown from Darlington to live with his father. (PSR, ¶ 85.) He remained employed as a machine operator in Mineral Point. (PSR, ¶ 96.) His employment—and freedom—only continued for a few months into 2017, when he was arrested at a Janesville Walmart for offering two 17-year-old males $300 for a sex act. (PSR, ¶ 65.) Liphart received a 15-month revocation sentence, which was appropriate for the known violation. (PSR, ¶ 65.) But it didn't account—and couldn't have accounted—for his conduct in 2015. His federal offense conduct here would remain concealed for the next three years.

In August 2018, Liphart was released to his second extended-supervision term. (PSR, ¶ 65.) One would have hoped that he would have taken the relatively short revocation sentence as an opportunity to make enduring changes. After all, if law enforcement had discovered his 2015 conduct before his revocation sentencing in 2017, it's a safe bet that he would have received the five-year maximum sentence—plus new criminal charges. Instead, he made it only about five months when, in January 2019, he was

arrested for propositioning another 17-year-old at a Dodgeville Walmart. (PSR, ¶ 66.)

Liphart returned to prison for the remainder of 2019 and into 2020. He was released in March, but in May he was arrested in his home for an alleged violation of his curfew, during which a police officer seized a cell phone. (PSR, ¶¶ 10-12, 65.) A search of the phone revealed his 2015 conduct, as well as 9 other images of child pornography. (PSR, ¶¶ 21-39.) He was again revoked, receiving a sentence of approximately 29 months, *i.e.*, his entire remaining extend-supervision term. (*See* PSR, ¶ 65.)

Today, Liphart remains in primary state custody with a release date of October 10, 2022. He's been locked up for the offense here since his arrest on May 26, 2020. (PSR, ¶ 1.)

### 4. A guidelines sentence would be appropriate here if Liphart had committed the offense conduct in 2020—but he didn't.

It's useful to begin the sentencing analysis with imagining an offender otherwise identical to Liphart but who committed the offense conduct in May 2020—not back in 2015. The offense conduct would reveal a troubling escalation beyond compulsive (and clumsy) efforts to solicit sex from young males. As of March 2020, the offender would have three prison trips in his rearview mirror, totaling about 11 years over the past 15. Then in May, about

two months into extended supervision, the offender would make the choice to pay a 14-year-old for sex—not to mention possess child pornography. A guidelines range sentence of 92 to 115 months would be amply justified. The Court couldn't just ignore the downward trend, especially considering the multiple revocations. Liphart isn't this offender.

5. **The Court should sentence Liphart to a concurrent 84 months' imprisonment because the sentence accounts for the offense conduct's distance in time without under-punishing him for it.**

Liphart may not have committed the crime last year, but that's not to say he's off the hook. One can't argue that his incarcerations since 2015 account for his offense conduct. That would be misguided. Combining his 2017 revocation, his 2019 revocation, and his pretrial confinement here, he's spent about 43 months locked-up. Even for a first-time offender, a 43-month term for paying for and having sex with a 14-year-old would not satisfy the goals of sentencing. And Liphart isn't a first-time offender.

The range without the computer-enhancement, which is 77 to 96 months' imprisonment, makes more sense here because it strikes the right balance between the two untenable positions. (*See* PSR, ¶ 119.) Liphart and the hypothetical 2020 offender are different, and the Court's sentence shouldn't treat them as if they were the same. Similarly, the Court shouldn't

simply "credit" Liphart for the incarceration time he's served since the offense conduct. That's not a just punishment. No doubt Liphart sees his post-2015 incarcerations as consequences for his choices—whether his agent knew about them or not. But he's not been held accountable formally for his crime.

A concurrent sentence of 84 months formally punishes him in ways that the previous incarcerations did not and could not. But it also accounts for the fact that Liphart didn't commit the offense conduct just last year. It takes Liphart as he is. He's not paid for his 2015 crime. He's still in need of rigid supervision while in the community. But he is a work-in-progress with some insight into his challenges—he's not a lost cause. (*See* PSR, ¶ 87.) If he were an inveterate sex offender, surely the cell phone would have had hundreds if not thousands of child pornography files on it. But it didn't.

No doubt his possessing the cell phone, and the 10 or so images on it, indicate something far short of full rehabilitation. But that he had dating apps on the phone is in some sense understandable. If the pandemic taught us anything, it's that isolation and loneliness are among human suffering's heavyweights. But because of his history, Liphart doesn't get the benefit of the doubt that he'll use those apps responsibly—at least not without the approval and supervision of his agent.

Everyone hopes that this time will be different for Liphart. But already there are mechanisms the Court's sentence imposes that will deliver ample deterrence and public protection. For starters, the Court's discretion with supervised release is profound. The minimum is five years, and it could impose a term up to the rest of his life. Non-criminal violations could send him back to prison for years and years—and he knows it. Plus, if he were to repeat the 2015 conduct again, the conviction here would mean another federal sentence. But it would be measured not in years but in decades. Regardless, Liphart's future is a choice between addressing his problems or earning a prison term that runs until or near the rest of his life.

Dated at Madison, Wisconsin, this July 6, 2021.

Respectfully submitted,

*Peter R. Moyers*

Peter R. Moyers
Counsel for Mr. Liphart

THE MOYERS LAW FIRM, LLC
601 Sawyer Terrace
#5041
Madison, Wisconsin 53705
Tel: 608-360-2478
moyerslawfirm@gmail.com